A91A1967. TURNER v. MCI TELECOMMUNICATIONS CORPORATION.
(416 SE2d 370)

BEASLEY, Judge.

This litigation arises from plaintiff Turner's attempted purchase

from defendant MCI of approximately 160,000 shares of common stock and warrants in a reorganized telecommunications corporation. MCI was to receive the securities in payment as a creditor of the corporation pursuant to a bankruptcy proceeding. The issue is whether either or both of two letters from Turner and his agent to MCI constituted written confirmation of an oral agreement for the sale of the securities under the statute of frauds, OCGA § 11-8-319 (c) of the Uniform Commercial Code-Investment Securities, OCGA § 11-8-101 et seq. The trial court found that it did not and granted summary judgment in favor of MCI.

Central Corporation was indebted to MCI in an amount exceeding $550,000. On November 30, 1988, Central was the debtor in possession in its voluntary petition for relief in the bankruptcy court under Chapter 11 of Title 11 of the United States Code. An amended plan of reorganization to be effective April 14, 1989, proposed that Central's business be carried on by a reorganized company to be known as Resurgens Communications Group, Inc.

Under such plan, MCI was classified as a general unsecured creditor and was to receive newly issued shares of common stock and warrants in Resurgens. A subclass of general unsecured creditors composed of AT&T and Regional Bell Operating Companies was to receive debt instruments rather than stock in order to avoid a possible legal impediment to receiving stock in another telecommunications company. MCI preferred to be in the subclass so that it too would receive debt instruments, but the plan was not so amended. Confirmation of the plan required affirmative vote of the creditors by April 11.

Marshall & Co., Inc., an investment banking firm and holding company for Marshall & Co. Securities, Inc. (MCSI), was to raise the capital to fund the amended reorganization plan to bring Central out of bankruptcy. Michael P. Marshall was chief executive officer of both Marshall & Co. and MCSI.

MCI was concerned about possible legal conflicts with receiving the proposed securities and also about the market for them. MCI representative Maloy, who was charged with determining whether the economics of the proposed amended plan of reorganization was acceptable to MCI, contacted Nash, the managing director of Marshall & Co. and one of Central's directors, and asked Nash if he could find someone who would be interested in purchasing the securities. About April 11, Nash telephoned Maloy and told him that he had a potential buyer and the terms of the purchase, ten percent down and the balance in a year. The potential buyer was Turner, an MCSI brokerage customer.

The first of the letters in question was dated April 11, 1989, and sent by Nash to Maloy: "In accordance with our conversations, this

letter will confirm that I have obtained, on your behalf, a bona fide offer for the securities you expect to receive in connection with the Central Corporation Debtor's Disclosure Statement and Amended Plan of Reorganization dated March 23, 1989.

"Generally and in accordance with the information available to me, and assuming the aforementioned plan is adopted, the new company's securities are issued, John D. Phillips emerges as C.E.O. of Newco and all other matters occur as we know them today, MCI will receive approximately 163,302 shares of Central Newco with an equal number of five year warrants exercisable at $3.50 per share.

"In exchange for the above described securities and within five days from the date such securities are received by MCI, the purchaser will deliver to MCI a check in the approximate amount of $16,330.00 (10%) and a signed promissory note for approximately $146,972.00 (90%). The promissory note will be due 12 months from the date of issuance, will bear interest at the rate of 10% and will be payable with the principle (sic) at maturity. The note will be collateralized with the above referenced securities.

"While Marshall & Company does not guarantee the above transaction, we believe that the purchaser and seller have entered into their commitment and agreement with every intention of closing it based on its aforementioned terms and conditions."

MCI made no written response to the letter. It cast its vote to accept the amended reorganization plan. On April 21, the bankruptcy court entered an "order on confirmation hearing" which included reduction of the exercise price of the issued warrants, increasing their value to the benefit of the general unsecured creditors.

On May 1, Michael Marshall told Maloy there was another investor interested in the Resurgens securities. It was Marshall, himself. On May 10, five days after the bankruptcy court confirmed the amended plan, Turner learned of Marshall's interest and called Maloy to discuss the securities.

The next day Turner sent Maloy a second letter, plus a check for $2,500. It stated: "Pursuant to our conversation on May 10, 1989, this letter will confirm our agreement with respect to my purchase of approximately 163,302 shares and warrants in the corporation formally (sic) known as Central Corporation.

"In exchange for the above described securities and within five days from the date such securities are received by MCI and MCI notifies me of such event, I will deliver to you a check in the approximate amount of $16,330 and a signed promissory note for approximately $146,972. The promissory note will be due twelve months from the date of issuance, will bear interest at the rate of ten percent and will be payable with the principal at maturity. I will be personally obligated on the promissory note.

"Enclosed please find a check payable to MCI in the amount of $2,500 representing earnest money with respect to the above transactions which will be credited toward the down payment. If you agree with the facts as specified above please sign a copy of this letter on behalf of MCI and return it to me in the enclosed envelope. Your prompt attention to this matter is greatly appreciated.

"If you have any further questions or comments please do not hesitate to call."

In the bottom left corner of the letter was typed:
        "MCI Communications, Inc.
        Accepted by: _____"
MCI never signed the acceptance line or negotiated the check.

On May 24, Maloy sent Marshall, as Turner's broker, Turner's $2,500 check and a letter reciting that the check was sent as part of Turner's offer for the stock MCI would receive and instructing Marshall to return the check to Turner because it did not plan to sell the stock at that time.

Turner sued MCI, MCSI, Marshall & Co., and Marshall individually. Count I alleged that MCI breached its agreement to sell the securities; Count II alleged that MCSI and Marshall & Co. breached its agreement to deliver the securities; Count III asserted that MCSI, Marshall & Co. and Mr. Marshall breached their fiduciary duties to Turner; Count IV maintained that MCSI, Marshall & Co. and Mr. Marshall intentionally interfered with the contractual relations between Turner and MCI; Count V alleged a conspiracy among the four defendants; and Count VI asserted that all defendants had been stubbornly litigious. As to all counts but the last, Turner claimed actual damages in excess of $40,000. Subsequently, Turner voluntarily dismissed the action against all defendants save MCI. MCI counterclaimed for abusive litigation but dismissed the counterclaim following the grant of summary judgment on the main claim.

Turner contends that summary judgment was erroneously granted because both the April 11 and May 11 letters clearly satisfied OCGA § 11-8-319 (c) or at least were sufficient under the statute of frauds to permit a jury to determine whether in fact an agreement for the sale of the securities was reached between the parties. He also complains that the trial court considered only the extrinsic evidence advanced by MCI and points to the consideration itself as indication that the letters were at the least ambiguous, requiring resolution by a jury.

Contract construction is a legal, rather than a factual, matter. Juries resolve questions of fact. OCGA § 13-2-1. Whether or not a writing is an enforceable contract under the securities statute of frauds is likewise a legal question. *Anderson Chem. Co. v. Portals Water Treatment*, 768 FSupp. 1568, 1577 (I) (M.D. Ga. 1991) engages these

principles.

As recognized in that case, OCGA § 11-8-319 "confines the evidence to be considered." Id. The statute specifies:

"A contract for the sale of securities is not enforceable by way of action or defense unless:

"(a) There is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity or described securities at a defined or stated price; or

"(b) Delivery of the security has been accepted or payment has been made but the contract is enforceable under this provision only to the extent of such delivery or payment; or

"(c) Within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) of this Code section has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten days after its receipt; or

"(d) The party against whom enforcement is sought admits in his pleading, testimony, or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price."

Thus, in the absence of delivery, payment or admission in judicio, an alleged agreement for the sale of securities is unenforceable unless its existence is reflected in writing which fulfills the requirements of either subsection (a) or subsection (c). *Anderson Chemical*, supra at 1577 (I), citing *Southeastern Waste Treatment v. Chem-Nuclear Systems*, 506 FSupp. 944, 949 (N.D. Ga. 1980), and applying subsection (a).

In this case, there was no acceptance of delivery of the securities. Nor was any of the proposed purchase price paid. The only money involved was Turner's $2,500 check offered solely as earnest money and never negotiated. This is not part performance as contemplated by the statute. See *Pelletier v. Stuart-James Co.*, 863 F2d 1550, 1555 at fn. 6 (11th Cir. 1989).

Neither was there a judicial admission of the existence of an agreement for sale of the securities to Turner. Either one of the letters relied on by Turner, or both taken together, must pass muster under subsections (a) or (c) of the statute.

The linchpin of Turner's argument is that MCI failed to object in writing to either letter within ten days of receipt, as required by subsection (c). That obligation arises only when the alleged confirmatory writing is sufficient against the sender under paragraph (a). That paragraph mandates that the writing be "sufficient to indicate that a contract has been made for sale of a stated quantity or described securities at a defined or stated price." Both letters fall short.

The April 11 letter on its face is not confirmation of an agreement certain in its material terms. Instead it relates an offer, which fact is expressly stated in the letter's first sentence and echoed in the last paragraph's denial of guarantee of the transaction and reference to a future "closing." Moreover, the vague and indefinite terms recited in the letter characterize it as merely an offer. It makes no reference to Resurgens stock but discusses "Newco" and "Central Newco." Even if it is accepted that the named entities refer to the reorganized corporation known as Resurgens and to issuance of Resurgens securities, the critical terms of quantity of securities and price are stated only as approximations.

The May 11 letter, on its face, suffers similarly. It addresses projected future acts and again recites the critical elements of quantity and price in merely approximate terms. Its true nature as a unilateral offer rather than a memorialization of a completed agreement is sealed by the blank provided for MCI's signature to show acceptance, which remained blank. Statement of facts, supra; see, e.g., *Great Western Sugar Co. v. Lone Star Donut Co.*, 567 FSupp. 340 (N.D. Tex. 1983).

Neither of the documents, nor both together, meet the requirements of OCGA § 11-8-319 as a matter of law. They are not enforceable for the sale of the anticipated securities to Turner. See, e.g., *Murrey v. Specialty Underwriters*, 233 Ga. 804 (213 SE2d 668) (1975). Summary judgment in favor of MCI was mandated.

Turner's complaint of consideration of unilateral extrinsic evidence is unavailing. First, he did not make such objection below. Rather, he asked the court to take notice of certain unilateral extrinsic evidence thought to be in his favor, namely that Nash was not an attorney at law and thus, the April 11 Nash letter should not be held to a standard of legal precision. Second, even if the trial court was apprised of limited extrinsic evidence in spite of the fact that the documents were facially plain and unambiguous, the transcript of the summary judgment hearing shows that the court's decision was based on the unadorned language of the documents themselves.

The ultimate determination was correct. A judgment right for any reason will be affirmed. See *Rowell v. Parker*, 192 Ga. App. 215, 216 (2) (384 SE2d 396) (1989); see also *Manderson & Assoc. v. Gore*, 193 Ga. App. 723, 732 (7) (389 SE2d 251) (1989).

*Judgment affirmed. Carley, P. J., and Judge Arnold Shulman concur.*

DECIDED FEBRUARY 25, 1992.

*David S. Delugas*, for appellant.

*Davis & Walker, Shawn D. Stafford,* for appellee.